AUSA:   John Engstrom            Telephone:  (313) 226-9571

AO 106 (Rev. 04/10)  Application for a Search Warrant    Special Agent:   Shanika Sanders    Telephone:  (313) 505-3173

# UNITED STATES DISTRICT COURT
for the
Eastern District of Michigan

| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No.   17-MC-50641-5 |
| 45923 HAYES ROAD SHELBY TOWNSHIP, MI 48315 | ) |
| | ) |

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

located in the _____ Eastern _____ District of _____ Michigan _____ , there is now concealed *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
| --- | --- |
| 18 U.S.C. §§ 1347, 1349 | Health Care Fraud; Conspiracy to Commit Health Care Fraud |
| 18 U.S.C. § 1954 | Kickbacks |

The application is based on these facts:

See attached AFFIDAVIT.

☑ Continued on the attached sheet.

☐ Delayed notice _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

SHANIKA SANDERS, Special Agent- DOL-OIG
*Printed name and title*

Sworn to before me and signed in my presence
and/or by reliable electronic means.

Date: _____ 11/14/17 _____

_____
*Judge's signature*

City and state:  Detroit, Michigan

Hon. R. Steven Whalen,     U. S. Magistrate Judge
*Printed name and title*

**AFFIDAVIT IN SUPPORT OF
AN APPLICATION FOR A SEARCH WARRANT**

I, Shanika Sanders, being first duly sworn, hereby depose and state as
follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.      I am a Special Agent with the Department of Labor, Office of the
Inspector General (DOL-OIG) and have been since January 2016.  As a Special
Agent in the DOL-OIG, I have received general law enforcement training at the
Federal Law Enforcement Training Center, as well as specialized training on the
subjects of fraud, waste and abuse, and I have been personally involved in
investigations concerning health care fraud, and methods used to finance and
conceal the profits of those operations.  Based on my knowledge and training,
individuals involved in fraud schemes as in this investigation, often make large
cash withdrawals in an effort to conceal and prevent seizure of illicit gains.  I have
interviewed employees of medical clinics.  I have investigated and conducted
surveillance on doctors as well.  I have consulted with agents and officers of
federal, state, and local agencies in order to gain an understanding of current trends
in health care fraud.  I am familiar with the Medicare program, as well as federal

healthcare fraud and laws.  I am currently assigned to the Detroit division of the

DOL-OIG and my duties include investigating health care fraud.  I am assigned to

an investigation pertaining to health care fraud by William A. Robinson and others

not named.  The information herein is known to me through personal knowledge

and investigation and/or from review of documents and interviews of people

having direct knowledge of these events.

2.      This affidavit is intended to show merely that there is sufficient

probable cause for the requested warrant and does not set forth all of my

knowledge about this matter.

## SUMMARY OF REQUEST

3.      Based on my training and experience and the facts as set forth in this

affidavit, there is probable cause to believe that violations of Health Care Fraud, 18

U.S.C. § 1347 (fraud) and Attempt and Conspiracy 18 U.S.C. § 1349 (conspiracy),

have been committed by William A. Robinson (ROBINSON) and others known

and unknown.  Specifically, ROBINSON owned and operated, along with others,

several hearing aid provider businesses.  In that capacity, he and others caused

numerous false claims for hearing aids, services, and products to be submitted to

Blue Cross Blue Shield of Michigan (BCBSM) and paid from 2010 through 2016.

4.      This affidavit is submitted in support of an Applications for Search

Warrant to search three retail hearing aid locations:

- Hear Here Corporation: 8033 E. 10 Mile Road, Suite106, Centerline, MI 48015;

- Hear Here Corporation: 22391 Ecorse Road, Taylor, MI 48180; and

- Hear Here Corporation: 45923 Hayes Road, Shelby TWP, MI 48315

these office suites are currently leased and occupied by Hear Here, a retail hearing

aid business.  The three business locations are fully described in Attachment A.


## JURISDICTION


5.      This Court has jurisdiction to issue the requested warrant because it is

"a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§

2703(a), (b)(1)(A) & (c)(1)(A).  Specifically, the Court is "a district court of the

United States . . . that – has jurisdiction over the offense being investigated." 18

U.S.C. § 2711(3)(A)(i).

## VIOLATION STATUTES

6.     Title 18 U.S.C. § 1347, prohibits health care fraud:  Whoever knowingly and     willfully executes, or attempts to execute, a scheme or artifice—

(1) to defraud any health care benefit program; or

(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

7.     Title 18 U.S.C. § 1349 provides that any person who attempts or conspires to commit health care fraud shall be subject to the same penalties as those proscribed in 18 U.S.C. § 1347.

8.     18 U.S.C. § 1954 whoever being an officer, counsel, agent, or employee of an organization of whose members are covered by such a plan receives or agrees to receive or solicits any fee, kickback, commission, gift, money, or thing of value because of or with the intent to be influenced relating to any matter concerning such plan.

9.     Title 18 U.S.C. § 24(b) defines a "health care benefit program" as, among other things, "any public or private plan . . . affecting commerce, under

4

which any medical benefit, item, or service is provided to any individual, and

includes any individual or entity who is providing a medical benefit, item, or

service, for which payment may be made under the plan."

## CORPORATE BACKGROUND

10.    Throughout the timeframe included in this investigation, 2010 through

2016, during this time period ROBINSON has been involved in the business

operation of all three requested search locations.  Also, through the timeframe of

this investigation the businesses operating at these locations have changed names.

Also, throughout the same time frame, there has been multiple owners of the below

mentioned businesses.  However, all named "owners" are close family members of

ROBINSION.  The corporate information is detailed below:

   a.  Hear Here Corporation (February 14, 2016 to present)

       Business Addresses:
       45923 Hayes Road, Shelby TWP, MI 48315
       22391 Ecorse Road, Taylor, MI 48180
       8033 E. 10 Mile Road Suite 106, Centerline, MI 48015
       NPI: 1982063277

       Mailing Address:
       476 Shotwell Rd Suite 102-257
       Clayton, NC 27520
       Owner: Edrea Lorraine Mann (ROBINSON's Daughter)

5

b.  William A. Robinson, Inc. (November 11, 1992 to December 7, 2016)

    8033 E. 10 Mile Road Suite 106
    Centerline, MI 48015
    NPI: 1205055415
    Owner: William Robinson

c.  Robinson Hearing Centers, LLC (January 2014 to December 7, 2016)

    Business Address:
    8033 E. 10 Mile Road Suite 106
    Centerline, MI 48015
    NPI: 1154752889
    Owner: Aaron Robinson (ROBINSON'S Son)

    Mailing Addresses:
    27920 Groesbeck Hwy, Roseville, MI 48066
    27728 Grant Street, Saint Clair Shores, MI 48081

d.  Quality Hearing Center, Inc. (November 10, 2009 to February 14, 2016)

    22391 Ecorse Road
    Taylor, MI 48180
    NPI: 1326378886
    Owner: Tamara Sulik (ROBINSON'S Step-daughter)

e.  Robinson Hearing Aid Services, LLC. (October 16, 2013 to June 13, 2017)

    22391 Ecorse Road
    Taylor, MI 48180
    NPI: 1326378886

6

Owner: Glenda Robinson (ROBINSON'S Wife)
October 16, 2013 to June 13, 2017

11.     According to the website of the Department of Licensing and

Regulatory Affairs (LARA) for the State of Michigan, ROBINSON obtained a

license as a hearing aid dealer in the state of Michigan.  ROBINSON's hearing aid

dealer license is currently active and set to expire on November 30, 2017.

12.     According to the LARA website, ROBINSON's listed business

address is 8033 E. 10 Mile Rd, Suite106, Centerline, Michigan.

13.     On December 6, 2010, ROBINSON provided BCBSM a BCBSM

Medicare Advantage PPO Provider Agreement and Practitioner Attachment on

behalf of William A. Robinson, Inc.  ROBINSON signed the certification, on

behalf of the business, indicating that he agreed, to be legally bound by the terms

and conditions of the agreement.  ROBINSON notated that he was a hearing aid

dealer on the Practitioner Attachment.  By signing this certification, ROBINSON

agreed that he would not knowingly present or cause to be presented a false or

fraudulent claim for payment to Medicare or BCBSM, and would not submit

claims with deliberate ignorance or reckless disregard of their truth or falsity.

14.     All of the companies associated with ROBINSON as listed above in

Paragraph 10 were required to complete a Hearing Specialist Participation

Agreement with BCBSM.  The Group Enrollment forms for the agreements

7

included the signatures of William A. Robinson, Aaron Robinson, Glenda

Robinson, and Tamara Sulik.  Edrea (Robinson) Mann signed as a Point of Contact

for William A. Robinson, Inc.


## PROBABLE CAUSE


15.    This investigation was predicated on a referral in 2016 by BCBSM of

allegations that a hearing aid provider, William A. Robinson, Inc., was billing

healthcare plans for hearing devices and services that were never provided to the

plan member.  BCBSM's initial investigation reported that ROBINSON was

fraudulently billing multiple insurance providers, including public and private

union healthcare funds.  BCBSM's internal investigation also revealed that

ROBINSON was not securing proper medical clearance or evaluations prior to

dispensing and billing for hearing aids.  Since 2000 there have been 42 complaints

made to the BCBSM anti-fraud hotline regarding ROBINSON and companies

associated with ROBINSON as described in Paragraph 10.  Victims include

members of FCA US, LLC, State of Michigan, Michigan Public School Employee

Retiree Plan, UAW Retiree Medical Benefit Trust, and Medicare.

16.    In order to receive reimbursement from BCBSM, a provider must

submit a claim, either electronically or using a form, containing the required

8

information appropriately identifying the provider, beneficiary, and services rendered, among other things.  The provider can elect to receive reimbursement via electronic funds transfer (EFT) or by check.

## False Hearing Aid Claims Billed to BCBSM

## Complainants LE and CE

17.     During an interview with BCBSM investigators, LE (age 77 at the time of interview) acknowledged that ROBINSON came to her home on January 7, 2014 and conducted a hearing examination.  Later, she stated that ROBINSON telephoned her and advised that her hearing aids were ready.  She stated that she declined his offer of hearing aids and never received hearing aids from ROBINSON.  LE claims she did not sign a contract to allow billing for hearing aids.

18.     During that same interview with the BCBSM investigators, LE's husband "CE" (age 93 at time of the interview) stated he was home when his wife (LE) was examined by ROBINSON, but that he remained upstairs and was not examined by ROBINSON at that time and did not receive hearing aids.

19.     A "conformity evaluation" is a procedure that occurs during a follow-up visit to the physician specialist, audiologist or hearing aid specialist or dealer who prescribed the hearing aid to verify that the patient received the prescribed

hearing aid and to evaluate its effectiveness.  Hearing aid providers may bill insurance providers for conducting conformity examinations.

20.     Neither LE nor CE received conformity evaluations because they never received hearing aids.

21.     On January 7, 2014, claims describing ROBINSON as the provider (the person conducting the exam) and hearing aid services rendered at the Centerline location were submitted to Blue Care Network (BCN) for members CE and LE.  William A. Robinson, Inc. sought reimbursement for in-the-ear hearing aids, audiometric testing, hearing aid assessment and conformity evaluations. BCN is a nonprofit health maintenance organization owned by BCBSM.  BCN paid $1,222 for each claim.

**Complainant LL**

22.     After an anti-fraud hotline complaint was filed, BCBSM investigators met with and interviewed the family members of LL (age 81 at the time of the interview).  During an interview with BCBSM investigators, family members of LL stated that ROBINSON visited LL's senior apartment building in the spring of 2015, without any advance notice.  He tested LL's hearing.  LL did not sign a contract to allow billing for the hearing aids, did not receive hearing aids, and did not have a conformity evaluation.

23.     On May 5, 2015, claims detailing ROBINSON as the provider were sent to BCBSM on behalf of member LL.  William A. Robinson, Inc. sought reimbursement for in-the-ear hearing aids, audiometric testing, hearing aid assessment and conformity evaluations. BCBSM paid $1,728 for the hearing aids, testing, and evaluation.  A BCBSM fraud investigator told the Affiant that he subsequently reviewed LL's patient chart and observed notes in the patient chart stating that LL refused to accept the hearing aids.  BCBSM investigators stated the claims paid on behalf of LL were later reversed, after an anti-fraud hotline complaint was filed to BCBSM.

**Complainant CW**

24.     A daughter of CW contacted BCBSM via the anti-fraud hotline on October 15, 2015 to report a false claim.  In a subsequent interview with a BCBSM investigator, CW's daughter stated that her mother, age 84 at the time of the interview, received a flyer from Robinson Hearing in the mail in September 2015. However, according to the daughter, her mother never met with ROBINSON and never received hearing aids from ROBINSON.  CW's daughter stated that CW is never left alone because of Alzheimer's and other health problems, and claimed that she is therefore aware of all of CW's doctor visits.

25.     On September 3 and 4, 2015, claims to BCBSM on behalf of CW were submitted describing ROBINSON as the provider at William A. Robinson,

Inc.  BCBSM paid $2,685 for hearing aids, audiometric testing, hearing aid assessment and conformity evaluation.  When ROBINSON was later asked about these claims by BCBSM investigators, ROBINSON maintained that he did in fact see CW, but acknowledged that his patient file did not contain a signed contract for hearing aids.  He characterized his paperwork as "sloppy."

## Complainant HR

26.   On November 7, 2012, claims were submitted to BCBSM on behalf of HR for in-the-ear hearing aids, audiometric testing, hearing aid assessment and conformity evaluations, which allegedly took place at William A. Robinson, Inc. The claims described ROBINSON as the provider of services.  BCBSM paid ROBINSON $1,723 based upon these claims.

27.   HR was 94 years old when her sister filed a complaint with BCBSM. After the complaint was filed, HR received hearing aids in the mail, even though she had never requested or agreed upon hearing aids. When ROBINSON was later interviewed by BCBSM investigators about this, he could not produce a file or any paperwork to justify the claims submitted to BCBSM on behalf of HR.

## Claimant JC

28.   On June 5, 2017, a federal investigator and BCBSM investigator met with JC to discuss claims for hearing aids billed to BCBSM for the years of 2010, 2013 and 2016.

29.     JC stated he first visit Robinson Hearing Center, in Centerline, MI in 2010 and received a single hearing aid.  JC also confirmed returning to the Centerline location in 2016, and receiving a single hearing aid.    On September 11, 2013, claims were submitted to BCBSM for JC.  The claims detailed ROBINSON as the provider.  William A. Robinson, Inc. sought reimbursement for audiometry for a hearing aid evaluation, assessment for hearing aid, binaural in-the-ear hearing aids, binaural dispensing fee, and a conformity evaluation.  BCBSM paid $1,155 for that claim.  JC denied being seen for hearing aids, or receiving any hearing aids in 2013.

**Claimant WH**

30.     On June 9, 2017, the Affiant and a BCBSM investigator met with WH to discuss claims for hearing aids and services billed to BCBSM for the years of 2013 and 2016.

31.     WH stated he first visit Quality Hearing Center, in Taylor, MI in 2013 and received a pair of hearing aids.  WH positively identified Tamara Sulik as the provider of his hearing exam and hearing aids.  WH also confirmed returning to the Taylor, MI location in 2016, for a hearing aid adjustment and cleaning.  Tamara's husband, Kenneth Sulik assisted WH with this visit.  WH also stated he noticed the name had been changed to Hear Here, but the same employees were there.

13

32.     On September 11, 2013, claims were submitted to BCBSM for WH. Quality Hearing Center sought reimbursement for an assessment for hearing aid, monaural in-the-ear hearing aid dispensing fee, and a conformity evaluation. BCBSM paid $1,155 for that claim.  The Affiant asked WH to retrieve his hearing aids.  WH had received behind-the-ear hearing aids, and not in-the-ear as stated on the claim paid by BCBSM.

**Claimant SH**

33.     On September 13, 2017, the Affiant and a BCBSM investigator met with SH to discuss claims for hearing aids and services billed to BCBSM for the years of 2012 and 2015.

34.     SH stated he first visit Quality Hearing Center, in Taylor, MI in 2012 and received a single hearing aid.  SH was told by Tamara Sulik he needed two hearing aids, but his insurance would only cover one hearing aid.  SH decided to just get one, and not pay out of pocket for a second hearing aid.  SH positively identified Tamara Sulik as the provider of his hearing exam and hearing aid.  SH also confirmed returning to the Taylor, MI location in 2015, for a hearing exam and new hearing aid.  Tamara's husband, Kenneth Sulik assisted his wife during both visits at Quality Hearing Center.

35.     On December 4, 2012, claims were submitted to BCBSM for SH. Quality Hearing Center sought reimbursement for an assessment for hearing aid,

hearing screening, binaural in-the-ear hearing aid dispensing fee, and binaural in-the-ear hearing aids.  BCBSM paid $1,117 for that claim.  The Affiant asked SH to retrieve his hearing aid.  SH had received a single monaural in-the-ear hearing aid, and not binaural in-the-ear hearing aids as stated on the claim paid by BCBSM.

**Claimants LB and JB**

36.     On September 13, 2017, your Affiant and a BCBSM investigator met with LB and her husband JB, to discuss claims for hearing aids billed to BCBSM. In 2012, LB stated she received an unsolicited call from ROBINSON about scheduling an appointment for a hearing test.  Both LB and JB visited Robinson Hearing Center, located in Centerline, MI.  They both received hearing aids at that time, which were billed to BCBSM.

37.     Under the terms of the BCBSM plan, they both were entitled to be retested and receive new hearing aids in 2015, if necessary.  JB did not think he needed the hearing aids that he received in 2012 and declined to be reevaluated in 2015.  In 2015, a home visit was conducted and LB received a new pair of hearing aids.

38.      On August 13, 2015, William A. Robinson, Inc. submitted claims to BCBSM on behalf of JB.  William A. Robinson, Inc. sought reimbursement for audiometry for a hearing aid evaluation, assessment for hearing aid, binaural in-

the-ear hearing aids, and a conformity evaluation.  BCBSM paid $2,448.12 for that claim.

39.     JB and his wife both denied that JB was examined in 2015 and were certain that he did not receive hearing aids from William A. Robinson, Inc. in 2015.

**Claimant TB**

40.     On September 13, 2017, your Affiant and a BCBSM investigator met with TB to discuss claims for hearing aids billed to BCBSM in 2015.  TB stated he had never received hearing aids.  TB also denied ever meeting ROBINSON or anyone affiliated with ROBINSON or the Robinson Companies.

41.     On November 17, 2015, claims were submitted to BCBSM for TB. The claim was submitted without a provider-of-services listed.  William A. Robinson, Inc., located in Centerline, sought reimbursement for audiometry for hearing aid evaluation, an assessment for hearing aid, conformity evaluation, and binaural in-the-ear hearing aids.  BCBSM paid $2,138.80 for that claim.  TB stated he was not aware of a claim for hearing aids, and denied allowing anyone to bill his insurance for hearing aids or hearing assessments.

42.     Since 2000, at least 30 complaints have been filed with BCBSM Corporate and Financial Investigations division complaining about hearing aids that were billed to BCBSM, but were not received by the member.  Because of

16

member complaints, BCBSM periodically sent letters to ROBINSON advising him to follow the guidelines in the BCBSM manual.  BCBSM records show that ROBINSON received such letter six times.

**Claims Falsely Identifying Jennifer Rowe As Service Provider**

43.     On October 25 and 26, 2017, a BCBSM Investigator interviewed three BCBSM members (JB, KT, and PG) for claims submitted on their behalf from Hear Here Corporation, for services rendered at the Shelby Township and Taylor locations.  The purpose was to confirm or deny services rendered by Jennifer Rowe, an audiologist employed by Hear Here Corporation, and to verify whether hearing aids billed to BCBSM were received by the claimants.

**Claimant JB**

44.     During an interview on October 25, 2017, JB confirmed that he went to the Hear Here location in Taylor, MI around December 20, 2016.  JB also stated he had been to that location previously and received hearing aids in 2010 and 2013. In 2016, JB believes that the female who tested his hearing was the owner, and that this female had a husband who worked at the location.  This observation suggests that the subject who did the hearing test was Tamara Sulik.  A claim was paid, listing an audiologist named Jennifer Rowe as the provider who rendered the hearing test.  However, in a separate interview conducted by the Affiant and a

17

BCBSM Investigator with JR on October 11, 2017, Jennifer Rowe confirmed she was no longer employed at Hear Here on the date of service indicated on the claim.

45.     On December 20, 2016, Hear Here sought reimbursement for an audiometry for hearing aid evaluation, and assessment for hearing aid.  BCBSM paid $126.26 for that claim.  Also, a claim was paid on November 18, 2013 for binaural in-the-ear hearing aids, instead JB received behind-the-ear hearing aids indicating the 2013 claim was falsely submitted also.  Those hearing aids were photographed by the BCBSM Investigator.

**Claimant KT**

46.     During the interview on October 25, 2017, KT confirmed that she went to the Hear Here location in Shelby Township, MI around December 2016. KT stated a female completed her hearing exam, but could not remember the name of the hearing aid provider.  In the claim submitted by Hear Here, the hearing aid service provider was described as an audiologist named Jennifer Rowe.  However, an interview conducted by the Affiant and a BCBSM Investigator, on October 11, 2017, with Jennifer Rowe confirmed she was no longer employed at Hear Here on the date of service indicated on the claim.

47.     On December 14, 2016, Hear Here sought reimbursement for an audiometry for hearing aid evaluation and assessment for hearing aid.  BCBSM paid $126.26 for that claim.

18

**Claimant PG**

48.     During an interview on October 26, 2017, PG confirmed that he went to the Hear Here location in Shelby Township, MI around November 30, 2016 after hearing a presentation at his local union retirees' meeting and being offered a free hearing test through a telephone solicitation.  After receiving what he thought was a free hearing test at Hear Here, PG was also given a free ham.   Hear Here then submitted to BCBSM a claim for audiometry services.  The claim falsely described audiologist Jennifer Rowe as the service provider.  An interview conducted by the Affiant and a BCBSM Investigator, on October 11, 2017, with Jennifer Rowe confirmed she was no longer employed at Hear Here on the date of service indicated on the claim.

49.     On November 30, 2016, Hear Here sought reimbursement for an audiometry for hearing aid evaluation.  BCBSM paid $45.73 for that claim.  The claim submitted to BCBSM, by Hear Here, shows that the hearing test received by PG was not free at all.

19

## BCBSM BILLING

50.     Data received from BCBSM in, or around, the end of 2016 showed that between the years 2010 through the first half of 2016, services amounting to an approximate total of $7,911,546 were billed to BCBSM by providers affiliated with ROBINSON and described in Paragraph 10 for services which were purportedly performed by ROBINSON or individuals affiliated with ROBINSON and the companies described in Paragraph 10.  For these billings, the companies described in Paragraph 10, received approximately $5,185,393.06 from BCBSM.

51.     Between 2010 and 2016, this investigation has confirmed at least sixteen instances in which the companies associated with ROBINSON, described in Paragraph 10, billed BCBSM for hearing aids that were never delivered to claimants.

52.     Between 2010 and 2016, the investigation has confirmed at least seventeen instances in which companies associated with ROBINSON as described in Paragraph 10 billed BCBSM for in-the-ear hearing aids, while claimants received behind-the-ear hearing aids.  In-the-ear hearing aids are more expensive than behind-the-ear hearing aids. The difference in the allowable amount of the claim paid for in-the-ear hearing aids, and the behind-the-ear hearing aids received

by claimants is approximately $128.

53.     Between 2010 and 2016, the investigation has confirmed at least fourteen instances in which companies associated with ROBINSON as described in Paragraph 10 billed BCBSM for binaural hearing aids, while the claimants received a single monaural hearing aid.  The filing of the false claim would benefit the companies as the cost of binaural hearing aids are more expensive than the cost of a single monaural hearing aid.

## INTERVIEW OF ROBINSON

54.     On January 12, 2016, ROBINSON was interviewed by investigators of BCBSM at the office of William A. Robinson, Inc. located at 8033 E. 10 Mile Rd., Centerline, MI 48015.  The interview regarded complaints involving five BCBSM members (see paragraphs 17-27 above).

55.     When asked by BCBSM investigators to provide the medical file for HR (see paragraph #26), ROBINSON was unable to produce a file, or any paperwork to justify the claims submitted to and paid by BCBSM.  During the interview, ROBINSON stated that he was aware of a pattern of "sloppy" recordkeeping.

56.     During the same interview, ROBINSON provided a medical file for CE (see paragraph #18) dated for 2007, to BCBSM investigators.  On CE's chart it

21

stated "did not test" and "not interested in test".  There was no signature, or any evidence to show that CE was seen by ROBINSON in 2014.  When asked about the claim submitted for CE in 2014, ROBINSON stated that upon review it should not have been filed.  When asked if this claim should be considered a false claim, ROBINSON stated he did not do it intentionally.

57.     During the same interview, ROBINSON provided the file for LE (see paragraph #17) dated March, 26, 2014.  The medical chart did not include a signed contract for hearing aids.  The file included a document labeled "return for credit," indicating that the hearing aids for LE were returned to the manufacturer.  The file also included a letter addressed to the BCBSM Corporate Recoveries division, and signed by ROBINSON, advising that the products provided LE were returned for credit.  However, BCBSM never received such a letter and the patient file contained nothing indicating that the letter was sent.

58.     During the same interview, ROBINSON provided the file for LL (see paragraph #22).  The file included records of an audiometry exam dated May 4, 2015.  Notes in the chart states LL refused to accept hearing aids.  There was also a note stating the aid was refunded October 30, 2015.  The BCBSM investigator noted this claim was only reversed after the anti-fraud hotline complaint was received by BCBSM November 12, 2015.

59.     During the same interview, ROBINSON could not provide a signed contract for hearing aids allegedly received by CW (see paragraph #24). ROBINSON produced a file for CW and it only contained an unsigned audiogram test.  ROBINSON acknowledged being sloppy with his paperwork.  ROBINSON also stated "he could see how the claim could be construed as a false claim."  Also, in the file were three letters addressed to BCBSM Corporate Recoveries.  BCBSM had no record of receiving the letters.

60.     During the interview, ROBINSON stated his daughter, Edrea Mann, submits the claims as the biller, however he acknowledged ultimate responsibility for the claims filed.  When asked what should happen to someone who has "sloppy" recordkeeping, ROBINSON stated they should be "put on suspension or something".

## INTERVIEWS OF FORMER EMPLOYEES

61.     On July 28, 2016, the Affiant and a BCBSM investigator interviewed a former employee (hereafter Employee 1) of William A. Robinson, Inc. Employee 1 was approached by Mrs. Glenda Robinson to help with organizational tasks at William A. Robinson, Inc., located at 8033 E. 10 Mile Road, Centerline,

Michigan, in early 2014.  Employee 1 stated s/he was terminated by ROBINSON

in August 2015, but a reason for termination was never provided.

62.    Employee 1 stated that ROBINSON hired a medical doctor to sign the

medical clearances that BCBSM required for payment on claims.  A medical

clearance signed by a practicing physician is a prerequisite for receiving benefits

for first time hearing aids with BCBSM.  Employee 1 stated when the doctor was

unavailable to sign a clearance, a nurse practitioner would forge the doctor's

signature.

63.    When asked about billing practices, Employee 1 stated s/he would

send the requested patient information via email to Edrea Mann (see paragraph

#15), in order to complete the billing for ROBINSON.  Employee 1 stated that

conformity tests, which occur during a follow up visit to verify that the patient

received the prescribed hearing aid, and to evaluate its effectiveness were always

billed.  In fact, according to Employee 1, these tests were to his/her knowledge

never performed.  Claims data submitted to BCBSM by companies associated with

ROBINSON, as described in Paragraph 10 often include charges for conformity

tests that were allegedly performed on the same day as the hearing test, and not on

a follow up date.  A conformity test, by its nature, must be conducted sometime

after the patient has had an opportunity to use the hearing aid for a period of time.

These records corroborate Employee 1's assertion that the companies associated

with ROBINSON, as described in Paragraph 10 were fraudulently billing for "conformity evaluations" that were not performed.

64.     Employee 1 also stated that if hearing aids were returned by a patient, the companies associated with ROBINSON, as described in Paragraph 10 still billed BCBSM.  ROBINSON would return the hearing aid to the supplier for a refund or credit, however BCBSM would not be notified to reverse the claim.

65.     During the same interview, Employee 1 stated s/he was paid for him/her to attend a national union meeting in Lansing, MI, in order to network with union officials.  Employee 1 would contact union officials and arrange to attend local retirees' union meetings.

66.     In early 2015, Employee 1 stated a union benefit chair board member known as M.M. provided him/her a list of union members' Personal Identifying Information (PII) during a retirees' union meeting he/she attended.  The list was provided to ROBINSON.  The next time Employee 1 saw M.M., M.M. showed up to William A. Robinson, Inc. requesting the money ROBINSON owed him/her for the list of names he/she provided.

67.     On November 14, 2016, the Affiant and a BCBSM investigator interviewed a former employee (hereafter Employee 2) of Hear Here Corporation. Employee 2 was interviewed and hired to work at the Taylor, Michigan location. Employee 2 started at the Taylor location, in February of 2016, and continued

25

working for Here Hear until May of 2016.  Employee 2 stated that s/he was one of

two audiologists that rotated between the three locations.  Employee 2 also stated

an employee named "Tina" was tasked with dispersing hearing aids on behalf of

ROBINSON.  Employee 2 stated that Tina was not professionally qualified to

disperse hearing aids.  Tina was not a trainee and had not received proper training.

Review of the LARA website confirmed that Tina was not in fact licensed to

complete the task.

## CASH WITHDRAWALS

68.     During the analysis of the bank accounts associated with the

businesses described in Paragraph 10, your Affiant notes numerous cash

withdrawals (via ATM and in person at a branch).  Between April 2015 through

August 2017, your Affiant identified 391 cash withdrawals totaling $526,198.84.

A breakdown of these transactions is detailed below:

| Account | Time Frame | Number of Withdrawals | Total Amount |
|---|---|---|---|
| Robinson Hearing Center, BOA #375013797721 | 4/15-4/17 | 300 | $426,954.00 |
| EL Mann, Inc., BOA #237033591854 | 2/16-8/17 | 91 | $99,244.84 |

| | Totals: | 391 | $526,198.84 |
|---|---|---|---|

The purpose of the cash withdrawals is unknown. Based on your Affiant's training and experience, it is reasonable to believe there may be funds in the form of cash at the search locations.

**Use of Computers and Electronic Storage Devices**

69.     Based on Affiant's training and experience, and in consultation with Special Agents trained in computer forensics, computer hardware, software, documentation, passwords, and data security devices may be important to a criminal investigation in two distinct and important respects:

      a.  The objects themselves may be instrumentalities, fruits or evidence of crime; and/or

      b.  The objects may have been used to collect and store information related to the crimes (in the form of electronic data).

70.     Computers and computer storage devices store the equivalent of thousands of pages of information. The user can store files in various locations and create deceptive file names to hide the true nature of the information contained within the files. Consequently, computer forensic examiners must examine all the stored data to determine whether it falls within the purview of the search warrant.

This sorting process can take weeks or months, depending on the volume of the data stored, and it would be impractical to attempt this kind of data search on site.

71.     Searches and seizures of evidence from computers commonly require agents to download or copy information from the computers and their components or seize most or all computer items (computer hardware, computer software, and computer related documentation) to be processed later by a qualified computer expert in a laboratory or other controlled environment.  This is almost always true because of the following two reasons:

a.  Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment.  The vast array of computer hardware and software available requires even computer experts to specialize in some systems and applications, so it is difficult to know before a search which expert should analyze the system and its data.  The search of a computer system is an exacting scientific procedure that is designed to protect the integrity of the evidence and to recover even hidden, erased, compressed, password-protected, or encrypted files.  Since computer evidence is extremely vulnerable to tampering or destruction (which may be caused by malicious code or normal

activities of an operating system), the controlled environment of a

laboratory is essential to its complete and accurate analysis; and

    b.  In order to fully retrieve data from a computer system, the computer

forensic examiner needs all magnetic storage devices as well as the

central processing unit (CPU).  In addition, the analyst needs all the

system software (operating systems or interfaces, and hardware

drivers) and any applications software which may have been used to

create the data (whether stored on hard drives or on external media).

72.    Because almost all hearing aid claims are currently filed via the

Internet, there is probable cause to believe that the computer(s) and its storage

and/or peripheral devices are all instrumentalities of crimes.  As a result, they

should all be seized as such.

73.    The search procedure of electronic data contained in computer

hardware, computer software, and/or memory storage devices may include the

following techniques (the following is a non-exclusive list, as other search

procedures may be used):

    a.  On-site triage of computer systems to determine what, if any,

peripheral devices or digital storage units have been connected to such

computer systems, as well as a preliminary scan of image files

29

contained on such systems and digital storage devices to help identify any other relevant evidence;

b.  Examination of all of the data contained in such computer hardware, computer software, or memory storage devices to view the data and determine whether that data falls within the items to be seized as set forth herein;

c.  Searching for and attempting to recover any deleted, hidden, or encrypted data to determine whether that data falls within the list of items to be seized as set forth herein (any data that is encrypted and unreadable will not be returned unless law enforcement personnel have determined that the data is not (1) an instrumentality of the offenses, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed, or (5) evidence of the offenses specified above);

d.  Surveying various file directories and the individual files they contain;

e.  Opening files in order to determine their contents;

f.  Scanning storage areas;

g.  Performing key word searches through all electronic storage areas to determine whether occurrences of language contained in such storage

areas exist that are likely to appear in the evidence described in
Attachment B; and

h.  Performing any other data analysis technique that may be necessary to
locate and retrieve the evidence described in Attachment B.

## CONCLUSION

74.     Based upon my investigation, the Affiant believes there is probable
cause to conclude that ROBINSON, and others as members of the Robinson
Companies, has committed and conspired to commit healthcare fraud since as early
as 2000.

75.     Based upon on the forgoing information, there is probable cause to
believe that the premises located at (1) 8033 E. 10 Mile Road, Suites106,
Centerline, MI 48015; (2) 22391 Ecorse Road, Taylor MI 48180, and (3) 45923
Hayes Road, Shelby Township, MI 48315, contain computers, computer
equipment, storage devices, records, documents, and files which represent
evidence, fruits and/or instrumentalities of the involvement of ROBINSON and
others in violation of 18 U.S.C. §§§ 1347, 1349, and 1954 with respect to the filing
of false claims for hearing aids, services, and products to Blue Cross Blue Shield
of Michigan.

31

76.     It is your Affiant's belief that the evidence located at the aforementioned addresses will illustrate the involvement of ROBINSON, and other companies associated with ROBINSON and more fully described in Paragraph 10, in the aforementioned healthcare fraud schemes, based upon, among other things, notes, accounting summaries, financial documents, journals/logs, patient records and other items fully described in Attachment B.

77.     Affiant respectfully requests that a search warrant be issued for the SUBJECT PREMISES (Attachment A) and to search for the items specified under Attachment B.

## REQUEST FOR SEALING

78.     I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may seriously jeopardize that investigation.

Respectfully submitted,

Shanika Sanders
Special Agent
Department of Labor-Office of
Inspector General

Sworn to before me and signed in my
presence and/or by reliable electronic means.

HON. R. STEVEN WHALEN
United States Magistrate Judge

DATED:     11/14/17

33

## ATTACHMENT A

**Hear Here Corporation**
**45923 Hayes Road**
**Shelby Township, MI 48315**

The business offices for Hear Hear Corporation are located within the Lifestyle Plaza retail strip mall located on the west side of Hayes Road, Shelby Township, between Hall Road and 21 Mile Road.  Hear Here offices are situated in between "Size Up Supplements" and "Massage TJR Spa" within the strip mall.  The numbers 45923 are clearly marked above the glass front entrance door.  A large sign with blue lettering is above the door indicated "Hear Here."

**ATTACHMENT B**

**ITEMS TO BE SEIZED**

For the time period of January 1, 2010 until November 15, 2017, any and all of the following items concerning or related to any individual or entity, known or unknown, who is reasonably believed to be part of the scheme or beneficiary of the scheme including but not limited to:

> Individuals: William A. Robinson, Tamara Sulik, Glenda Robinson, Aaron Robinson and Edrea L. Robinson AKA Edrea L. Mann

> Entities: William A. Robinson, Inc., Quality Hearing Center, Inc., Robinson Hearing Centers, LLC and Inc., Robinson Hearing Aid Services, LLC., E.L. Mann, Inc. and Hear Here Corporation

This information may be stored or filed and includes any format in which the information may exist, including but not limited to the media of hard copy, computer hard disks, digital storage devices, and or computer disks:

1. All records related in any way to all patients, including without limitation, the following type of records: patient charts, files, records, treatment cards, patient ledger cards, patient complaints, patient sign-in sheets, employee notes, original patient or referral source listing, patient correspondence, appointment books, business calendars and sign-in sheets;
2. All documents constituting, concerning, or relating to bills, invoices, and claims for payment or reimbursement for services billed to patients or insurance companies, including Medicare, for any patients;
3. All documents constituting, concerning, or relating to invoices for the purchase of hearing aid dealer related equipment, including, without limitation hearing testing equipment or hearing amplification devices;
4. All documents constituting, concerning, or relating to any returns of hearing aid dealer related equipment, including, without limitation hearing testing equipment or hearing amplification devices;
5. All financial statements, records, and documents, including without limitation:

    a.  Bank accounts, money market accounts, checking accounts, equity line of credit, investment accounts, stock fund accounts, bonds or bond funds; including deposit and reimbursements, cancelled checks or drafts, electronic transfers, ledgers, loan statements, and loan agreements;

    b.  Credit/Automatic Teller Machine/Debit card accounts;

    c.  All corporate, business, and personal tax returns, including without limitation, any quarterly employment tax returns, withholding records, W-2s, and any Internal Revenue Service Form 1099s;

    d.  All financial statements and credit reports;

    e.  All loan and credit information, including, without limitation, any letters of credit, revolving credit arrangements, loans, loan applications, financing agreements, factoring arrangements, promissory notes, leases, or any other documents concerning sources of borrowed funds

    f.  All accounts payable and receivable records

6. All documents consisting, concerning or relating to all current and former employees, including without limitation, personnel files, employee rosters, names, addresses, telephone numbers, email address, time cards and similar records, expense reports, training information, certification verification, salary and compensation information, disciplinary records, licensure records, job applications, job descriptions, employment agreements and W-2 forms;

7. Organizational or corporate papers filed with the appropriate state agencies and any amendments thereto, including, without limitation, articles of incorporation, by-laws, and annual reports;

8. All correspondence, including memoranda, letters, and electronic mailings (email) between William A. Robinson and employees, Edrea L. Robinson (Mann) and employees, Joyce Arnold and employees, past and current, of William A. Robinson, Inc. and Hear Here Corporation;

9. All correspondence, including memoranda, letters, and electronic mailings (email) concerning any of the records described in the previous paragraphs;

10. All documents related to the purchase, leasing, servicing, or operation of any durable medical, physical therapy, laboratory or other medical equipment;

11. Records of control over other areas such as storage units where financial, medical, or other billing records may be maintained;

12. Records of control of the premises and things described, namely, utility bills, telephone bills, rent or lease records pertaining to or evidencing ownership or control of the premises to be searched;

13. Currency or other items of significant value reasonably believed to be the proceeds of the illegal activity described in the affidavit for this search warrant;

14. Records related to assets or items of significant value reasonably believed to be proceeds of the illegal activity described in the affidavit for this search warrant;

15. Audit or inspection records relating to any state or federal investigation;

16. All retrievable information such as recorded telephone messages, and other electronically stored information and computer hardware, including, without limitation, floppy discs, compact discs or other data storage discs or tapes, thumb or flash drives. Any electronic storage media, including, without limitation, cellular telephones, pagers, electronic organizers, tablet computers, and PDAs, may be held for such reasonable time as necessary to determine whether it contains data within the scope of this warrant. Where data is found a personal computer storage drive file, the agents executing this warrant are authorized to seize, where necessary, the computer's input/output or "I/O" devices, software, documentation, and data security devices. When the computer analyst determines that these items are no longer necessary to retrieve and preserve that data evidence, they will be returned within a reasonable time;

17. Instructions, memoranda, passwords, and other information relating to, or required to facilitate the operation of any equipment which contains any of the aforementioned information.

18. Any and all correspondence or mailings to/from Blue Cross Blue Shield of Michigan;

19. Any and all records, documents or correspondence relating to insurance rules, regulations, requirements, and/or audits;

20. All contracts, billing agreements, professional services agreements, or any other contracts between the above referenced individuals or business, and any other individual, company, physician or billing company as it relates to the solicitation of patients;

21. All documents related to information pertaining to the following union and/or UAW matters:
    a. Billing matters or raffles;
    b. Payments to and/or from union officials;
    c. Scheduling of meetings and events;
    d. Recruitment of retired beneficiaries;
    e. Lists and names of union members (including PII)
    f. Offers of free hearing aids and/or services; and
    g. Information relating to who created, used, or communicated with the union officials including records about their identities and whereabouts

22. Regarding records and information pertaining to the above stated offense which may be stored in digital form, law enforcement personnel executing this search warrant will employ the following procedure in searching for data capable of being read, stored or interpreted by a computer:

    a. Computer equipment and storage devices will be seized and transported to an appropriate law enforcement laboratory for review. The computer equipment and storage devices will be reviewed by appropriately trained personnel in order to extract and seize any data that falls within the list of items to be seized set forth herein.

    b. Any data storage device that is encrypted and unreadable will not be returned until law enforcement personnel have determined that it or its data do not constitute (1) an instrumentality of the offense, (2) a fruit of the criminal activity, (3) contraband, (4) otherwise unlawfully possessed property, or (5) items that fall within the list of items to be seized set forth within.

    c. In searching the data, computer personnel may examine all of the data contained in the computer equipment and storage devices to view their

precise contents and determine whether the data falls within the items to be seized as set forth herein.

d. If the computer personnel determine that the computer equipment and storage devices are no longer necessary to retrieve and preserve the data, and the items are not subject to seizure pursuant to Federal Rule of Criminal Procedure 41 (b), the government will return these items within a reasonable period of time.

e. In order to search for data pertaining to the above stated offenses that is capable of being read or interpreted by a computer, law enforcement personnel will need to seize and search the following items, subject to the procedures set forth above:

   i.   Any computer equipment and storage device capable of being used to commit or store evidence of the offenses listed above;

   ii.  Any computer equipment used to facilitate the transmission, creation, display, encoding or storage of data, including but not limited to word processing equipment, modems, docking stations, monitors, printer, plotters, encryption devices, and optical scanners;

   iii. Any magnetic, electronic or optical storage device capable of storing data such as floppy disks, fixed hard disk drives, external hard drives and enclosures, network attached storage units, removable hard disk cartridges, tapes, laser disks, videocassettes, CD's, DVD's, zip disks, smart cards, memory sticks, memory calculators, PDA's, USB flash drives, printers and fax machines with memory buffers, PC cards, electronic dialers, electronic notebooks, mobile telephones, answering machines and/or other media that is capable of storing magnetic coding;

   iv.  Any documentation, operating logs and reference manuals regarding the operation of the computer equipment, storage devices, or software;

v.  Any applications, utility programs, compilers, interpreters, and other software used to facilitate direct or indirect communication with the computer hardware, storage devices or data to be searched;

vi.  Any physical keys, encryption devices or similar physical items that are necessary to gain access to the computer equipment, storage devices or data; and

vii.  Any passwords, password files, test keys, encryption codes, or other information necessary to access the computer equipment, storage devices or data.

23. The terms records, documents, communications, and applications, includes all of the foregoing items of evidence in whatever form and by whatever means such records, documents, communications, applications, their drafts or their modifications may have been created or stored, including (but not limited to) any handmade form (such as writing or drawing with any implement, on any surface, directly or indirectly); any photographic form (such as microfilm, microfiche, prints, slides, negative, videotapes, photocopies); any mechanical form (such as printing or typing); any electrical, electronic or magnetic form (such as tape recordings, cassettes, compact discs, or any information on an electronic or magnetic storage device, such as floppy diskettes, hard drives, backup tapes, CD ROMs, optical discs, printer buffers, smart cards, memory calculators, or electronic notebooks, as well as printouts and readouts from any magnetic storage device).

AUSA:   John Engstrom                    Telephone:  (313) 226-9571

AO 93  (Rev. 11/13) Search and Seizure Warrant        Special Agent:        Shanika Sanders        Telephone:  (313) 505-3173

# UNITED STATES DISTRICT COURT
### for the
### Eastern District of Michigan

In the Matter of the Search of                    )
*(Briefly describe the property to be searched*    )
*or identify the person by name and address)*      )    Case No.    17-MC-50641-5
                                                   )
45923 HAYES ROAD                                   )
SHELBY TOWNSHIP, MI 48315                           )
                                                   )

## SEARCH AND SEIZURE WARRANT

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the _____ Eastern _____ District of _____ Michigan _____ .
*(identify the person or describe the property to be searched and give its location)*:

See ATTACHMENT A.

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See ATTACHMENT B.

**YOU ARE COMMANDED** to execute this warrant on or before   November 26, 2017 _____  *(not to exceed 14 days)*
☑ in the daytime 6:00 a.m. to 10:00 p.m.      ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to  the presiding United States Magistrate Judge on duty _____ .
*(United States Magistrate Judge)*

☐   Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☐ for _____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____ .

Date and time issued:   11/14/17
                        9:23 am _____                    _____
                                                              *Judge's signature*

City and state:   Detroit, Michigan _____       Hon. R. Steven Whalen,   U. S. Magistrate Judge
                                                              *Printed name and title*

AO 93  (Rev. 11/13) Search and Seizure Warrant (Page 2)

| **Return** | | |
|---|---|---|
| Case No.:<br>   17-MC-50641-5 | Date and time warrant executed: | Copy of warrant and inventory left with: |
| Inventory made in the presence of : | | |
| Inventory of the property taken and name of any person(s) seized: | | |

| **Certification** |
|---|

   I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.


Date:  _____

_____
*Executing officer's signature*

_____
*Printed name and title*